# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-1568V**
**Filed: October 19, 2026**

| | |
|---|---|
| VICTORIA S. PETROVIC, administrator of the Estate of KATHLEEN R. McNAMEE,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Simina Vourlis, Law Offices of Simina Vourlis, Columbus, OH, for petitioner.*
*Lynn Christina Schlie, U.S. Department of Justice, Washington, DC, for respondent.*

**RULING ON ENTITLEMENT**[1]

On July 13, 2021, Kathleen McNamee filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012).[2] (ECF No. 1.) The petition alleges that she suffered anaphylaxis, atrial fibrillation, vasoplegia, stroke, seizures, and sequela, after receiving an influenza ("flu") vaccination on October 16, 2020. (*Id.*) After Ms. McNamee later passed away, her estate representative, Victoria Petrovic, was substituted as petitioner. (ECF No. 67.) In her motion for a ruling on the written record, petitioner argues that Ms. McNamee's vaccination caused vomiting, which led to dehydration that triggered atrial fibrillation, stroke, and seizures. (ECF No. 78, pp. 16, 46.) For the reasons set forth below, I conclude that petitioner is entitled to an award of compensation.

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citation to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

## I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table. In such instances, an alternative means exists to demonstrate entitlement to a Program award. That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question. § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii). In such a situation, of course, the presumptions available under the Vaccine Injury Table are inoperative. The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991). In this case, petitioner has not alleged an injury that appears on the Vaccine Injury Table relative to the flu vaccine.[3] 42 C.F.R. § 100.3(a). Therefore, petitioner must demonstrate causation-in-fact.

The showing of causation-in-fact must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1278-79; *Hines*, 940 F.2d at 1525. Under that standard, petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury. *Althen*, 418 F.3d at 1279. She need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition at issue and was a "but for" cause.

---

[3] Although the petition initially included anaphylaxis among the conditions alleged, which is a Table Injury for the flu vaccine, petitioner did not ultimately argue that Ms. McNamee experienced anaphylaxis. Her medical records do not, on the whole, indicate that her treating physicians felt she had experienced anaphylaxis and petitioner's experts did not assert that she experienced anaphylaxis. The experts did discuss a potential hypersensitivity reaction; however, hypersensitivity and anaphylaxis are not coextensive and, without more, reference to a hypersensitivity reaction does not suggest a clinical presentation that fits the specific definition of anaphylaxis included in the Qualifications and Aids to Interpretation that accompany the Vaccine Injury Table.

*Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Ultimately, petitioner must satisfy what has come to be known as the *Althen* test, which requires: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Id*.

A petitioner may rely on circumstantial evidence, *Althen*, 418 F.3d at 1280, but may not receive a Vaccine Program award based solely on his or her assertions, § 300aa-13(a)(1). Rather, the petition must be supported by either medical records or by the opinion of a competent physician. *Id*. The *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention. *Althen*, 418 F.3d at 1279-80. However, while scientific certainty is not required, the medical opinion supporting a petitioner's claim must be based on "sound and reliable" medical or scientific explanation. *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. § 300aa-13(b)(1).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II. Procedural History

Petitioner filed medical records marked as Exhibit 1-23 in July through September of 2021 (ECF Nos. 7-9, 13, 15-16; Exs. 1-23), and the case was assigned to the undersigned in February of 2022 (ECF Nos. 22-23). Petitioner then filed an initial report by immunologist Omid Akbari, Ph.D., in July of 2022. (ECF Nos. 28-29, 31; Exs. 24-37.) Respondent filed his Rule 4 Report, recommending against compensation in November of 2022, accompanied by expert reports by immunologist Andew

MacGinnitie, M.D., Ph.D., and neurologist Steven Messé, M.D. (ECF Nos. 35-37; Exs. A-D.)

In January of 2023, I held a Rule 5 conference. (ECF No. 38.) I advised that:

> [I]t appears that this case will turn on whether petitioner's preexisting risk factors (advanced age, hypertension, hyperlipidemia, coronary artery disease, tobacco use, pneumonia diagnosis upon admission, as well as both lung and colon cancer) were so substantial as to fully explain her stroke or whether her episode of vomiting and diarrhea constituted an acute vaccine reaction that, in turn, may have acted as a tipping point in petitioner's condition leading to stroke and thereby rendering the vaccination a substantial contributing factor in bringing about her injury. To that end, I advised petitioner that more evidence would be needed to demonstrate how petitioner's high dose Fluzone vaccine caused her acute episode and further how that episode in turn contributed to her cardiovascular event.

(*Id*. at 1-2.) In particular, I was critical of Dr. Akbari's initial report and advised that petitioner would likely need an opinion by an expert qualified in cardiovascular medicine to meet her burden of proof. (*Id.* at 2-3.)

Petitioner then filed a report by an additional expert, cardiologist C. Alan Brown, M.D. (ECF Nos. 39-41; Exs. 39-47.) She also filed a supplemental report by Dr. Akbari. (ECF Nos. 44-47; Exs. 48-77.) Thereafter, the parties exchanged additional reports by Drs. Akbari (Exs. 80-99, 102-20), Brown (Exs. 78-79), and MacGinnitie (Exs. E-G).[4] The parties ultimately agreed that the case was ripe for briefing. (ECF No. 76.) Petitioner filed a motion for a ruling on the written record in January of 2025, which was fully briefed as of September of 2025. (ECF Nos. 78, 85, 90.)

I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

---

[4] I stress that, for the reasons discussed below, petitioner has prevailed based in large part on her medical records and the opinion of her treating cardiologist, with additional support from her cardiology expert. Despite having filed multiple lengthy reports, Dr. Akbari's opinion, which I note below I did not find credible, did not factor significantly in this outcome. And, indeed, I cautioned petitioner's counsel on this point during the Rule 5 conference, explaining that Dr. Akbari's initial report, despite its length and breadth, did not grapple with the actual issues in the case and advising that I "will be reviewing Dr. Akbari's billing records closely in this case as I am concerned that the substance of his report would not justify substantial billing." (ECF No. 38, pp. 2-3.) Counsel in the Program should take note that, while I permitted petitioner the latitude to develop Dr. Akbari's opinion in this case, this was done at counsel and Dr. Akbari's own risk vis-à-vis reimbursement of attorneys' fees and costs.

## III. Factual History

Ms. McNamee received the Fluzone flu vaccination at issue, a high dose formulation, at around 6:00 PM on October 16, 2020, at seventy-one years of age. (Ex. 3, p. 5; Ex. 4, pp. 202, 275.) She had a prior history of coronary artery disease, Barrett's esophagus, hypertension, and hyperlipidemia. (Ex. 1, pp. 19-24; Ex. 2, p. 8.) She was noted to have been a heavy smoker. (Ex. 5, p. 52.) Respondent stresses that she was being followed by a cardiologist, Dr. Hussain, for her coronary artery disease post-stent placement. (ECF No. 85, p. 2 (citing Ex. 2, pp. 8-11).) However, petitioner notes that a primary care examination of August 24, 2020, was unremarkable and that Ms. McNamee saw Dr. Hussain just hours prior to the vaccination at issue, at which time she had no new complaints and her heart rate was documented as regular with no murmur or gallop. (ECF No. 78, pp. 4, 37-38 (citing Ex. 1, pp. 18-24; Ex. 2, p. 8).)

About three hours post-vaccination, around 9:00 PM, Ms. McNamee experienced nausea with vomiting and diarrhea. (Ex. 4, pp. 182, 202, 275.) Specifically, after noting the fact of her vaccination, the documented history indicates that:

> when she returned home felt fine until later that evening when she suddenly had the onset of nausea while drinking some wine socially (was on a second glass diluted with soda.) This was quickly followed by "violent" vomiting and diarrhea, body aches, shivering which persisted through the night. Her daughter had moved some bedding to sleep on the patient's floor at her bedside and there was a point where she found her mother on the floor "after letting herself down" due to weakness on the way to the restroom. Later in the night patient's daughter awoke to her falling off the bed. She tried to help her up but decided to call EMS instead. EMS had apparently reported left-sided facial droop, left-sided weakness, dysarthria.

(*Id.* at 182.)

Ms. McNamee was transported by ambulance to the emergency department, arriving at approximately 5:00 AM on October 17, 2020, and was admitted to the hospital. (Ex. 4, pp. 162-63, 275.) She presented with stroke-like symptoms (weakness, facial droop, and dysarthria) affecting her left side and she was hypotensive and in atrial fibrillation. An embolic cerebrovascular accident was suspected. (*Id*. at 165-77, 202-06.) In particular, a brain CT was concerning for a right middle cerebral artery distribution stroke, and a CT angiography of the neck demonstrated a 50-60% stenosis at the origin of the right internal carotid artery. (*Id*. at 189, 275.) Ms. McNamee was reportedly "significantly dehydrated" (*Id*. at 202), though respondent disputes that there is clinical evidence of dehydration (ECF No. 85, p. 26). To that point, petitioner notes that Ms. McNamee's urinalysis demonstrated high urine specific gravity of 1.057, which she contends is consistent with dehydration. (ECF No. 78, p. 5 (citing Ex. 4, p. 113).) Respondent counters that Ms. McNamee's BUN (blood urea nitrogen) result, which was normal, confirms she was not dehydrated. (ECF No. 85, p. 26 (citing Ex. A, p. 3; Ex. 4, p. 105).) However, she was treated with multiple boluses of

lactated Ringer's fluid,[5] after which she became more hemodynamically stable, though she also received norepinephrine infusion by central venous catheter due to continuing hypotension. (Ex. 4, pp. 166, 205-06.) Her daughter also reported that she had a fever (*Id*. at 165), but she was noted to be negative for fever by that time (*Id*.). Although there were no overt signs of infection, a CT scan was concerning for pneumonia and blood tests showed elevated white blood cells. (*Id*. at 99-103, 206.) Accordingly, she was started on antibiotics, though pneumonia was not definitively diagnosed and it was noted she had no signs of infection. (*Id*. at 190, 206, 238, 240.) Although the initial atrial fibrillation spontaneously resolved, Ms. McNamee also experienced a second episode of atrial fibrillation while she remained in the ICU. (*Id.* at 182, 189, 300.)

During the course of her hospitalization, Ms. McNamee was seen by her treating cardiologist, Dr. Hussain. (Ex. 4, pp. 182-91.) Dr. Hussain documented essentially the same history as above, characterizing Ms. McNamee's initial symptoms as "flu-like." (*Id*. at 182, 189.) Her atrial fibrillation had spontaneously converted, but she remained hypotensive. (*Id.* at 182, 189-90.) Troponin and lactate were both initially elevated, but lactate normalized with supportive care. (*Id.* at 182.) Dr. Hussain noted that urinalysis suggested intravascular volume depletion. (*Id.*) Dr. Hussain's assessment was atrial fibrillation of "presumably new onset." (*Id*. at 189-90.) However, she felt that the hypotension was likely noncardiogenic and unrelated to the atrial fibrillation because Ms. McNamee had no known history of significant valvular disease of lower ventricular systolic dysfunction. (*Id*. at 190.) Dr. Hussain noted that petitioner was hypovolemic upon presentation, but also suggested a distributive etiology was possible before ultimately stating that the etiology for petitioner's hypotension was unclear.[6] (*Id*.) She documented that: "Patient had no preceding signs or symptoms of an infectious process during her office visit 10/16 (note that vomiting and vasoplegia were uncommon adverse effects of the Fluzone high dose influenza vaccine in postmarketing.)" (*Id*.) She also noted that Ms. McNamee was at risk for recurrent atrial fibrillation given her history of underlying cardiovascular disease. (*Id*.) However, [w]hile she does have approximately

---

[5] Lactated Ringer fluid is a solution of calcium chloride, potassium chloride, sodium chloride, and sodium lactate in water that is given as a fluid and electrolyte replenisher. *Lactated Ringer injection*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=82812 (last visited Oct. 5, 2026). It has several uses, including treatment of both dehydration and hypotension. *Ringer Lactate Solution*, WIKIPEDIA, https://en.wikipedia.org/wiki/Ringer%27s_lactate_solution (last visited Oct. 5, 2026); *Ringer's Lactate Solution: What it is and How It's Used*, HEALTHLINE, https://www.healthline.com/health/lactated-ringers (last visited Oct. 5, 2026).

[6] Hypovolemic shock can refer to either absolute hypovolemic shock, which is caused by acute hemorrhage or excessive fluid loss, or relative hypovolemic shock, which is characterized by insufficient, though normal, blood volume due to widespread vasodilation. *Hypovolemic shock*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=105938 (last visited Oct. 7, 2026). Hypotension is one of the clinical characteristics. *Id.* Distributive shock or vasodilatory shock is characterized by systemic vasodilation leading to decreased blood flow to the brain, heart, and kidneys and damage to viral organs. Nicholas Smith et al., *Distributive Shock*, STATPEARLS, https://www.ncbi.nlm.nih.gov/sites/books/NBK470316/ (last visited Oct. 7, 2026). The most common causes of distributive shock are anaphylaxis and sepsis, with distributive shock resulting from sepsis typically occurring as a result of dysregulated immune response to infection that leads to systemic cytokine release and resultant vasodilation and fluid leak from capillaries. *Id*.

50 to 60% right-sided carotid artery stenosis, atrial fibrillation is more likely the cause of her stroke." (*Id.*) Ms. McNamee was discharged to inpatient rehabilitation on October 22, 2020. (*Id.* at 200-01.)

Ms. McNamee remained in inpatient rehabilitation from October 22 through October 29, 2020. (Ex. 5, p. 26.) During that period, she had a neurology follow up. (*Id*. at 52-53.) The neurologist documented a history whereby "Friday evening, [Ms. McNamee] started having fever, chills, malaise, and seems like some adverse reactions from flu vaccine." (*Id*. at 52.) After reviewing petitioner's hospital course and conducting a physical exam, the neurologist concluded:

> The patient is actually looking well, very minimum deficit I can see. I do not see any evidence of significant neurological impairment. It was a cardioembolic CVA. Perhaps embolism could have propagated part down in the small arterials and blood flow could have been established, very minimum ischemia could have remained. She will stay on Eliquis forever. She will stay on Crestor, metoprolol. Her condition looks well. No leukocytosis. Very mild anemia. Electrolytes are normal. Discussed with the patient and the patient's daughter at bedside about the current situation, plan of care and pathophysiology of the event. The patient looks well. Maintain same therapy.

(*Id*. at 53.) Ms. McNamee was discharged home with directions to continue home health nursing and outpatient physical, occupational, and speech therapy. (*Id.* at 33.)

Ms. McNamee saw her primary care provider again on November 2, 2020. (Ex. 1, pp. 13-17.) She reported essentially the same history as above. On November 4, 2020, petitioner (Ms. Petrovic) filed a VAERS report on behalf of Ms. McNamee. (Ex. 7.) Respondent stresses that neither of these histories included the presence of fever. (ECF No. 85, p. 26.) In fact, the VAERS report explicitly states that Ms. McNamee had a normal temperature of 97.5 degrees. (Ex. 7, p. 3.) Ms. McNamee sought a second opinion from the Cleveland Clinic Cerebrovascular Center, having an initial visit on November 5, 2020. (Ex. 8, p. 9.) The impression was "right MCA stroke appears embolic and is likely cardioembolic in the setting of new onset a.fib diagnosed while in the hospital . . . . However, there is some concern for narrowing of the right common carotid artery origin which could be real versus artifactual." (*Id.* at 14.)

Subsequently, Ms. McNamee went on to develop seizures and recurrent episodes of atrial fibrillation, and she was found to have a malignant neoplasm in her colon and her lung. She died on May 26, 2023, due to lung adenocarcinoma. (Ex. 100, p. 1.) It is not necessary to detail the remainder of Ms. McNamee's history. Respondent has not challenged that this case meets the Vaccine Act's severity requirement. (ECF Nos. 35, 85.) Petitioner does not contend that Ms. McNamee's death was related to her alleged vaccine injury.

## IV. Summary of Expert Opinions

### a. Immunologist Omid Akbari, Ph.D., for petitioner[7]

Dr. Akbari presented four reports in this case. (Exs. 24, 48, 80, 100.) In his first report, Dr. Akbari provided an overview of the immune system, including mechanisms of autoimmunity (Ex. 24, pp. 5-10, 15-16), and proposed that vaccines can cause stroke directly via inflammatory mechanisms (*Id*. at 10-15), before then concluding that his theory of causation and causal opinion were based on the notion that the vaccination had caused nausea and vomiting leading to dehydration and a "domino effect" resulting in stroke (*Id*. at 5, 16-17). However, despite a lengthy discussion of the immune system, he never explained how the vaccine would lead to nausea and vomiting or how dehydration would lead to atrial fibrillation and stroke.

In his second report, Dr. Akbari presented a theory that the flu vaccine can activate inflammasomes, which he opined could explain either a direct causal relationship to atrial fibrillation and stroke or which could explain how the vaccine could cause nausea and vomiting leading to the dehydration underlying petitioner's cardiology expert's opinion. (Ex. 48.) He provided the following graphic:




(*Id*. at 15.)

In his third and fourth reports, Dr. Akbari sought to defend his inflammasome theory against criticism from respondent's immunology expert, Dr. MacGinnitie. (Exs. 80, 100.) However, because the outcome of this case does not turn on Dr. Akbari's inflammasome theory, it is not necessary to go into detail regarding Dr. Akbari and Dr. MacGinnitie's differences on that topic. Ultimately, Dr. Akbari's relevant opinion boils down to the assertion, supported by citation to four papers, that activated IL-1β, which he asserts to be a product of post-vaccination inflammasome activation, "is a potent endogenous factor and induces symptoms such as chills, rigors, fever, nausea,

---

[7] Dr. Akbari received his Ph.D. in cellular and molecular immunology from the University of London in 1998, before going on to complete a post-doctoral fellowship at Stanford University in 2001. (Ex. 37, p. 1.) He maintains a position as a professor of immunology at the University of Southern California, Los Angeles. (*Id.* at 2.) Prior to that, he worked as a research scientist in the Division of Allergy and Immunology at Stanford University and an assistant professor of pediatrics in the Division of Immunology at Harvard Medical School. (*Id.*) Pertinent here, Dr. Akbari's research "involves investigating and characterizing the mechanisms underlying the regulation of the acquired and innate immune responses." (Ex. 24, p. 2.) He has authored over 100 publications. (Ex. 37, pp. 9-17.)

vomiting, headache and fatigue when injected into humans." (Ex. 48, p. 3 (citing Charles A. Dinarello, *IL-1: Discoveries, Controversies and Future Directions*, 40 EUR. J. IMMUNOLOGY 595 (2010) (Ex. 53); Charles A. Dinarello, *Biologic Basis for Interleukin-1 in Disease*, 87 BLOOD 2095 (1996) (Ex. 54)); *see also* Ex. 80, p. 7 (citing Xiaoyu Liu et al., *Cell-Type-Specific Interleukin 1Reception 1 Signaling in the Brain Regulates Distinct Neuroimmune Activities*, 50 IMMUNITY 317 (2019) (Ex. 90); Janice P. Dutcher et al., *Report of a Phase I Evaluation of Dose and Schedule of Interleukin-1 Alpha and Cyclophosphamide in Patients with Advanced Tumors: An Eastern Cooperative Oncology Group Study (PX990) and Review of IL-1-Based Studies of Hematopoietic Reconstitution*, 34 J. INTERFERON & CYTOKINE RSCH. 376 (2014) (Ex. 91)).)

**b. Cardiologist C. Alan Brown, M.D., for petitioner[8]**

Dr. Brown filed two reports in this case. (Exs. 47, 78.) Based on his review of Ms. McNamee's medical records, Dr. Brown opined that her acute episode of a sudden onset of nausea with vomiting, diarrhea, and chills within a few hours of vaccination represented an adverse reaction to her flu vaccination. (Ex. 47, pp. 3, 5.) Moreover, he concluded that the vomiting and diarrhea resulted in severe dehydration that in turn caused atrial fibrillation leading to a cardioembolic stroke. (*Id.* at 5.)

Dr. Brown explained that atrial fibrillation, which is due to degeneration of the electrical impulses of the upper cardiac chambers, confers an increased risk of stroke due to the formation of atrial thrombi, usually in the left atrial appendage, that break loose and embolize to the cerebral arteries. (Ex. 47, pp. 5-6 (citing Daniel J. Cantillon & Ram Amuthan, *Atrial Fibrillation*, CLEVELAND CLINIC: CTR. FOR CONTINUING ED. (Aug. 2018) (Ex. 39)).) In fact, atrial fibrillation is a leading cause of stroke due to cardiac embolism. (*Id.* at 7 (citing Ashwin A. Pilal et al., *Cardioembolic Stroke*, STATPEARLS, https://www.ncbi.nlm.nih.gov/books/NBK536990/?report=printable (last updated July 4, 2022) (Ex. 41)).) Moreover, atrial fibrillation can be triggered by the adrenergic nervous system. He explained that:

> Dehydration due to vomiting and diarrhea results in stimulation of the adrenergic sympathetic nervous system that innervates the heart and is integral to control of heart rhythm and circulation. Activation of the sympathetic nervous system increases the body's levels of adrenalin (epinephrine) and results in the "fight or flight" response characterized by

[8] Dr. Brown received his medical degree from Harvard Medical School in 1972, before going on to complete an internship and residency at Massachusetts General Hospital in 1976, as well as a fellowship in immunology and a clinical and research fellowship at Massachusetts General Hospital in 1977 and 1981, respectively. (Ex. 46, p. 1.) He is board certified in internal medicine, cardiovascular disease, and interventional cardiology, and he maintains an active medical license in California. (*Id.* at 1, 3.) He maintains a position as an associate clinical professor of medicine at the University of Southern California School of Medicine. (*Id.* at 2.) Prior to that, he worked as a clinical and interventional cardiologist with the Santa Barbara Cardiovascular Medical Group, and from there, he accepted a position as a Chief Medical Information Officer for Cottage Health System. (Ex. 47, p. 1; Ex. 46, p. 3.) Dr. Brown has authored eight publications, and six abstracts. (Ex. 46, pp. 5-6.)

> increases in heart rate and blood pressure. Sympathetic activation by physiologic stressors such as dehydration are recognized triggers of [atrial fibrillation].

(*Id.* at 6 (citing Anthony J. Workman, *Cardiac Adrenergic Control and Atrial Fibrillation*, 381 NAUNYN SCHMIEDEBERGS ARCHIVES PHARMACOLOGY 35 (2010) (Ex. 40)).)

In Ms. McNamee's case, Dr. Brown stressed that, although she had a history of treated coronary artery disease, hypertension, and hyperlipidemia, she had no prior history of atrial fibrillation and, just hours before receiving the vaccination at issue, she had an encounter with her treating cardiologist that confirmed she was asymptomatic and in regular sinus rhythm. (Ex. 47, p. 7.) However, after she had her acute episode of vomiting and other symptoms, she presented to the emergency department with a new onset of atrial fibrillation, as well as hypovolemia and hypotension. (*Id*.) Moreover, her urine specific gravity was markedly elevated at 1.057, which indicates significant dehydration. (*Id*.) After supportive measures, her blood pressure and heart rhythm stabilized. (*Id*.) Thus, Dr. Brown opines that Ms. McNamee's dehydration, which he attributes to her adverse vaccine reaction, was the trigger of her atrial fibrillation. (*Id*. at 8.)

Dr. Brown cited a study by Woo et al., documenting that nausea and vomiting have been among the reported non-serious adverse events following high-dose flu vaccination. (Ex. 47, p. 9 (citing Emily Jane Woo & Pedro L. Moro, *Postmarketing Safety Surveillance of High-Dose Quadrivalent Influenza Vaccine: Reports to the Vaccine Adverse Event Reporting System*, 40 VACCINE 1026 (2022) (Ex. 44)).) Moreover, he stressed that Ms. McNamee's treating cardiologist had accepted that the postmarketing experience for the high-dose Fluzone vaccine had documented vomiting as among the less common reported adverse events. (*Id*. (citing Ex. 4, p. 190).) Dr. Brown at turns sought to characterize the nature of the immune response that might lead to nausea and vomiting (sometimes citing hypersensitivity and sometimes citing Dr. Akbari's inflammasome theory); however, he ultimately stressed in his supplemental report that "once the Fluzone vaccine triggered nausea and vomiting in [Ms.] McNamee causing dehydration, a series of physiologic rather than immunologic events occurred resulting in [Ms.] McNamee's stroke." (Ex. 78, p. 2.)

### c. Immunologist Andew MacGinnitie, M.D., Ph.D., for respondent[9]

Dr. MacGinnitie prepared four reports in this case. (Exs. A, E-G.) Although he stressed that Ms. McNamee had numerous risk factors for stroke, he deferred to respondent's other expert, Dr. Messé, regarding the appropriate diagnosis and causes for stroke. (Ex. A, p. 6.) Nonetheless, suggested that "it is not clear why vaccination needs to be invoked as a trigger, given that she was unfortunately at very high risk of stroke at baseline," and he stressed that epidemiology shows that the flu vaccine lowers the risk for stroke. (*Id.* at 8 (citing Kyu Rae Lee et al., *Effect of Influenza Vaccination on Risk of Stroke: A Systematic Review and Meta-Analysis*, 48 NEUROEPIDEMIOLOGY 103(2017) (Ex. A, Tab 5)).) Dr. MacGinnitie stressed that vaccination is only "a minor immune stimulus," explaining that "vaccinations, which typically cause minor, if any, systemic symptoms such as fever, do not represent an unusual stimulus for the immune system." (*Id*. at 9.) He further observed that Ms. McNamee had no evidence of any local inflammatory response at the vaccine injection site and suggested a systemic reaction is unlikely without a local reaction. (*Id*. at 7.) He also noted that none of Ms. McNamee's physicians attributed her stroke to her vaccination. (*Id*. at 9-10.)

Dr. MacGinnitie was highly critical of Dr. Akbari's theory of causation, both because it lacked a coherent, logical step-by-step theory of causation and because it at least partly invoked an adaptive immune response, which would not have occurred in the 2-3 hours between Ms. McNamee's vaccination and her initial symptoms of nausea and vomiting. (Ex. A, pp. 6-7.) Thereafter, much of Dr. MacGinnitie's three supplemental reports were devoted to challenging the specific inflammasome-based theory that Dr. Akbari developed in his later reports. (Ex. E-G.) In his later reports, Dr. MacGinnitie further challenged whether even the innate immune response cited by Dr. Akbari could occur within 2-3 hours. (Ex. E, p. 7.)

In response to Dr. Brown, Dr. MacGinnitie opined that the lack of fever in Ms. McNamee's case is significant because IL-1, which is invoked by Dr. Akbari's inflammasome theory, is a key mediator of fever. (Ex. E, p. 4 (citing Mubeccel Akdis et al., *Interleukins (From IL-1 to IL-38), Interferons, Transforming Growth Factor β, and TNG-α: Receptors, Functions, and Roles in Diseases*, 138 J. ALLERGY & CLINICAL IMMUNOLOGY 984 (2016) (Ex. E, Tab 9)).) Thus, Dr. MacGinnitie questioned the lack of

---

[9] Dr. MacGinnitie received his Ph.D. in pathology and medical degree from Pritzker School of Medicine at the University of Chicago in1996 and 1998, respectively, before going on to complete a residency in pediatrics at Boston Combined Residency Program in 2001, as well as a fellowship in allergy/immunology at the Children's Hospital Boston and a clinical fellowship in pediatrics at Harvard Medical School in 2004. (Ex. B, p. 1.) From there, Dr. MacGinnitie accepted a position as an assistant professor in pediatrics at the University of Pittsburgh. (*Id.*) He moved on to Harvard Medical School in 2011, where he was eventually elevated to associate professor of pediatrics. (*Id.* at 1-2.) During that time, Dr. MacGinnitie also maintained a clinical position as an attending physician in pediatrics allergy/immunology, first at Children's Hospital of Pittsburgh of UPMC and then at Children's Hospital Boston, as well as a brief stint as an attending physician at South Shore Hospital. (*Id.* at 2.) He is board certified in pediatrics, as well as allergy and immunology, and he maintains an active medical license in Massachusetts. (*Id.* at 11.) He has performed research and published articles "in a number of areas related to Allergy/Immunology including food allergy, vaccine reactions, and primary immunodeficiency." (Ex. A, p. 2.)

a mechanism by which the vaccination could result in vomiting and diarrhea but not fever. (*Id.*) He discounted the value of the Woo study, noting that is relies on voluntary reporting to VAERS and that the flu vaccine is commonly administered in the fall when viral illnesses are common. (*Id.*) Dr. MacGinnitie stressed that diseases associated with inflammasome activity are not characterized by isolated vomiting, dehydration, or atrial fibrillation. (*Id*. at 4-5.) He also did not agree that Ms. McNamee was dehydrated, noting that her BUN was normal. (Ex. A, p. 3 (citing Ex. 4, p. 105).)

**d. Neurologist Steven Messé, M.D., for respondent[10]**

Dr. Messé prepared one report, which was filed in response to Dr. Akbari's initial report and prior to the filing of Dr. Brown's reports. (Ex. C.) He opined that Ms. McNamee suffered a right middle cerebral artery stroke unrelated to her vaccination, stressing that the flu vaccine reduces, rather than elevates, the risk for both stroke and atrial fibrillation. (*Id.* at 3-5. (citing Armin J. Grau et al., *Influenza Vaccination Is Associated With a Reduced Risk of Stroke*, 36 STROKE 1501 (2005) (Ex. C, Tab 1); A. Niroshan Siriwardena et al., *Influenza and Pneumococcal Vaccination and Risk of Stroke or Transient Ischaemic Attack–Matched Case Control Study*, 32 VACCINE 1354 (2014) (Ex. C, Tab 2); Liam Smeeth et al., *Risk of Myocardial Infarction and Stroke After Acute Infection or Vaccination*, 351 NEJM 2611 (2004) (Ex. C, Tab 3); Zahid Asghar et al., *Influenza Vaccination and Risk of Stroke: Self-Controlled Case-Series Study*, 33 VACCINE 5458 (2015) (Ex. C, Tab 4); Ting-Yung Chang et al., *The Association Between Influenza Infection, Vaccination, and Atrial Fibrillation: A Nationwide Case-Control Study*, 13 HEART RHYTHM 1189 (2016) (Ex. C, Tab 11)).) Dr. Messé noted that stroke is a heterogeneous disorder with many mechanisms. (*Id.* at 4.) In Ms. McNamee's case, he agrees that her stroke was due to atrial fibrillation, which he notes to be one of the most common causes of stroke. (*Id.*) However, he attributed her atrial fibrillation to extensive preexisting vascular risk factors, including advanced age, hypertension, hyperlipidemia, coronary artery disease, and smoking, coupled with pneumonia and cancer. (*Id.* (citing Mina K. Chung et al., *Lifestyle and Risk Factor Modification for Reduction of Atrial Fibrillation: A Scientific Statement From the American Heart Association*, 141 CIRCULATION e750 (2020) (Ex. C, Tab 5)).) Pneumonia, in particular, is

[10] Dr. Messé received his medical degree from the University of Michigan School of Medicine in 1998, before going on to complete an internship, neurology residency, and stroke and neurocritical care fellowship at the Hospital of the University of Pennsylvania in 1999, 2002, and 2003, respectively. (Ex. D, p. 1.) He is board certified in neurology and vascular neurology, and he maintains an active medical license in Pennsylvania. (*Id.* at 2.) He currently works as an associate professor in the Division of Stroke and Neurocritical Care of the Department of Neurology, as well as the Director of the Vascular Neurology Fellowship, at the University of Pennsylvania School of Medicine. (*Id.* at 1; Ex. C, p. 1.) In those positions, he has cared for "thousands of patients with cerebrovascular disease in the inpatient and outpatient setting, trained hundreds of medical students, residents, and fellows, and have published extensively on issues related to cerebrovascular disease." (Ex. C, p. 1.) Dr. Messé has also served as a member of the American Academy of Neurology Guideline Development Committee. (*Id.*) In that capacity, he authored "multiple clinical practice guidelines that are based upon systematic literature reviews requiring critical assessments of study methodology and risk of bias in publications." (*Id.*) Additionally, Dr. Messé has served on the Classification of Evidence review panel for *Neurology* since 2016. (*Id.* at 2.)

a well-known trigger of atrial fibrillation. (*Id.* (citing Wendy A. Wattigney et al., *Increasing Trends in Hospitalization for Atrial Fibrillation in the United States, 1985 Through 1999: Implications for Primary Prevention*, 108 CIRCULATION 711 (2003) (Ex. C, Tab 6)).) Dr. Messé also did not agree that Ms. McNamee's preceding episode of nausea and vomiting was related to her flu vaccination, citing two studies that found no increase in incidences of gastrointestinal events following high-dose flu vaccination. (*Id.* (citing H. Keipp Talbot et al., *Gastrointestinal Events in High-Dose vs Standard-Dose Influenza Vaccine Recipients*, 5 OPEN FORUM INFECTIOUS DISEASES 1 (2018) (Ex. C, Tab 9); H. Keipp Talbot et al., *Immunogenicity, Safety and Consistency of New Trivalent Inactivated Influenza Vaccine*, 26 VACCINE 4057 (2008) (Ex. C, Tab 10)).) However, he did not address the question of whether dehydration contributed to Ms. McNamee's outcome.[11]

## V. Analysis

### a. *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," showing that the subject vaccine can cause the type of injury alleged. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006)). Such a theory need only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)). However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory. While it does not require medical or scientific certainty, it must still be 'sound and reliable.'" *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); then quoting *Knudsen*, 35 F.3d at 548-49). That is, although petitioners are not required to prove their theories in any one way, they must in all events support their proffered theory with sound and reliable scientific explanation, *id.* at 1359, and provide evidence that establishes on balance that the vaccine at issue can more likely than not cause the injury at issue, *Cerrone v. Sec'y of Health & Human Servs.*, 146 F.4th 1113, 1120-23 (Fed. Cir. 2025).

In this case, petitioner advances a multi-step theory. First, she theorizes that Ms. McNamee's flu vaccine activated inflammasome pathways that in turn stimulated the brain's nausea and vomiting centers and pathways, leading to severe vomiting. Second, she proposes that Ms. McNamee's vomiting was severe enough to result in

[11] Although Dr. Messé's report pre-dated Dr. Brown's, Dr. Akbari did at least nominally make an issue of Ms. McNamee's dehydration in his first report.

dehydration. Third, she contends that dehydration can then trigger atrial fibrillation and, fourth, that atrial fibrillation can result in a cardioembolic stroke. (ECF No. 78, pp. 18-19.) Petitioner does not dispute that medical literature shows that the flu vaccine lowers the risk of stroke; however, she argues that is irrelevant because she disclaims any contention that the flu vaccine directly caused Ms. McNamee's stroke. (ECF No. 90, pp. 4-5.)

In response, respondent initially stresses that literature supports the notion that the flu vaccine actually reduces the risk of stroke. (ECF No. 85, pp. 12-13.) He also disputes that there is preponderant evidence that the flu vaccine can cause nausea and vomiting, specifically challenging the theory that it would do so via inflammasome activation. (*Id*. at 14-23.) Respondent argues that

> in lieu of meaningful corroboration in the medical literature for the proposition that the flu vaccine can cause any of Ms. McNamee's conditions, much less the precise sequence required to demonstrate that the flu vaccine ultimately resulted in her stroke, petitioner pieces together immunological concepts from unrelated conditions and vaccines in an unsuccessful attempt to extrapolate the general concepts of immunology to the present circumstances.

(*Id*. at 23.)

To be clear, Dr. Akbari's reports have been a significant point of litigation between the parties and they do contain assertions that the flu vaccine can cause immune responses – most notably activation of inflammasomes – leading directly to atrial fibrillation and stroke. (Ex. 24, p. 14; Ex. 48, pp. 10-11.) However, Dr. Akbari is not a medical doctor and petitioner's clinical expert, cardiologist C. Alan Brown, disclaimed any direct relationship between Ms. McNamee's immune response to vaccination and her atrial fibrillation leading to stroke. (Ex. 78, p. 1.) He opined instead that the atrial fibrillation was due to dehydration brought on by vomiting and diarrhea. (*Id.*) In his supplemental report, Dr. Brown stressed that, distinct from Dr. Akbari's opinion, he proposes "a series of physiologic rather than immunologic events." (*Id.* at 2.) Moreover, petitioner herself ultimately disclaimed reliance on a direct causal relationship between Ms. McNamee's vaccination and stroke within her briefing. (ECF No. 90, p. 4.) Thus, it is not necessary to fully discuss that aspect of Dr. Akbari's opinion, which, as respondent suggests, has distracted from, rather than illuminated, the core issue in this case.

Nonetheless, I note in the interest of completeness that I have considered the question of a direct causal relationship between Ms. McNamee's vaccination and her atrial fibrillation and stroke and conclude that respondent's experts are more persuasive on this point, given the record evidence as a whole. This is consistent with prior Program experience. Many prior petitioners have failed to demonstrate that the flu

vaccine can cause stroke or other acute cardiovascular events.[12] Notable to this point, I do not find Dr. Akbari's reliance on inflammasome activation to be sufficiently credible.[13] Dr. Akbari has a well-established track record of invoking inflammasome activation in seeking to describe how various vaccines have resulted in various conditions. He has done this based on citation to a small number of articles, such as Crooke et al. and Wang et al., which likewise feature prominently in his opinion in this case. However, he otherwise quotes Crooke et al. as acknowledging that, "[w]hile the inflammasome has been implicated as a critical component for protective immunity against influenza in several animal studies, there have been no prior studies investigating this phenomenon or how it relates to vaccine response in human populations." (Ex. 48, pp. 2-3 (quoting Stephen N. Crooke et al., *Inflammasome Activity in Response to Influenza Vaccination Is Maintained in Monocyte-Derived Peripheral Blood Macrophages in Older Adults*, 2 FRONTIERS AGING 1 (2021) (Ex. 49)).) Yet, Dr. Akbari continually invokes post-vaccination inflammasome activation as the root of many disparate conditions without paying much care to the type of condition at issue. Indeed, in this very case, Dr. Akbari invokes inflammasome activation not only as a cause of atrial fibrillation, but also as the cause of discrete episodes of vomiting as a stimulator of the emetic center of the brain. (Ex. 80, p. 7.) Moreover, he inadvertently slipped into asserting in his third report that discussion of inflammasomes is important because (he asserts) they are implicated in demyelinating diseases, which are conspicuously not at issue here. (*Id.* at 7-8.) If there is any limit to Dr. Akbari's willingness to blame any condition on inflammasome activation, it is not yet apparent.[14] Indeed, Dr. Akbari's four reports in this particular

---

[12] *E.g.*, *Adams v. Sec'y of Health & Human Servs.*, No. 19-929V, 2025 WL 2754698 (Fed. Cl. Spec. Mstr. Sep. 3, 2025); *Goff v. Sec'y of Health & Human Servs*., No. 17-259V, 2025 WL 431582 (Fed. Cl. Spec. Mstr. Jan. 13, 2025), *mot. for rev. denied*, 177 Fed. Cl. 506 (2025); *Druery v. Sec'y of Health & Human Servs*., No. 17-1213V, 2023 WL 5094088 (Fed. Cl. Spec. Mstr. July 11, 2023), *mot. for rev. denied*, 169 Fed. Cl. 557 (2024); *Singleton v. Sec'y of Health & Human Servs.*, No. 17-1474V, 2023 WL 3595653 (Fed. Cl. Spec. Mstr. Apr. 28, 2023); *Baldwin v. Sec'y of Health & Human Servs*., No. 13-957V, 2020 WL 4197937 (Fed. Cl. Spec. Mstr. June 4, 2020), *mot. for rev. denied*, 151 Fed. Cl. 431 (2020); *Schultz v. Sec'y of Health & Human Servs.*, No. 16-539V, 2020 WL 1039161 (Fed. Cl. Spec. Mstr. Jan. 24, 2020); *Sokol v. Sec'y of Health & Human Servs*., No. 16-1631V, 2020 WL 553842 (Fed. Cl. Spec. Mstr. Jan. 9, 2020); *Hayward v. Sec'y of Health & Human Servs*., No. 15-005V, 2018 WL 2772495 (Fed. Cl. Spec. Mstr. May 4, 2018). *But see Irwin v. Sec'y of Health & Human Servs*., No. 16-1454V, 2024 WL 863690 (Fed. Cl. Spec. Mstr. Jan. 23, 2024); *Halverson v. Sec'y of Health & Human Servs*., No. 15-227V, 2020 WL 992588 (Fed. Cl. Spec. Mstr. Feb. 4, 2020).

[13] A special master's decision may be in part "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1362 (Fed. Cir. 2000)). Indeed, weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325-26 ("Assessments as to the reliability of expert testimony often turn on credibility determinations . . . ."); *see also Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("[T]his court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act.").

[14] Recently, I issued a decision rejecting Dr. Akbari's opinion that inflammasome activation explains how the flu vaccine could cause small fiber neuropathy. *Holsworth v. Sec'y of Health & Human Servs*., No. 20-1263V, 2026 WL 2607559 (Fed. Cl. Spec. Mstr. July 24, 2026). Not long before that, I issued a

case, which are overlong, overbroad, and often repetitive, are consistent with prior criticisms of his work.[15]

However, the lack of a direct causal relationship between the vaccination and stroke is not dispositive of whether petitioner has preponderantly established that the flu vaccine can commence the specific sequence of events that she and Dr. Brown proposed. Although respondent disputes that petitioner has preponderantly shown that the flu vaccine can cause nausea and vomiting, he has not contested that vomiting can lead to dehydration or that dehydration could be a tipping point that could result in atrial fibrillation and stroke, especially given the presence of multiple pre-existing risk factors. Indeed, the parties' experts agree that atrial fibrillation is a common cause of stroke (Ex. C, p. 4; Ex. 47, p. 6), and Dr. Brown has offered an uncontested opinion that activation of the sympathetic nervous system by physiologic stressors, including dehydration, can cause atrial fibrillation (Ex. 47, p. 6). Accordingly, if petitioner is persuasive in linking the flu vaccine to vomiting, then that would suffice for a theory of causation under *Althen* prong one linking Ms. McNamee's vaccination to the remainder of the causal chain.

---

decision explaining why Dr. Akbari had not persuasively invoked inflammasome activation as a means by which either the hepatitis B or flu vaccines could cause rheumatoid arthritis. *Cote v. Sec'y of Health & Human Servs*., No. 18-1350V, 2026 WL 1555934 (Fed. Cl. Spec. Mstr. Mar. 27, 2026), *mot. for rev. denied*, No. 181350, 2026 WL 2508991 (Fed. Cl. Aug. 24 2026). Other special masters have unfavorably considered Dr. Akbari's invocation of inflammasomes relative to whether either the Tdap or MMR vaccines can cause acute disseminated encephalomyelitis, *Ampofo-Addo v. Sec'y of Health & Human Servs*., No. 21-1231V, 2025 WL 2463643 (Fed. Cl. Spec. Mstr. July 31, 2025), whether the flu vaccine can cause fibromyalgia, *Williams v. Sec'y of Health & Human Servs*., No. 19-1269V, 2024 WL 5040482 (Fed. Cl. Spec. Mstr. Nov. 13, 2024), and whether the flu vaccine can cause anhidrosis, *Efron v. Sec'y of Health & Human Servs*., No. 20-1405V, 2025 WL 408219 (Fed. Cl. Spec. Mstr. Jan. 2, 2025). The *Efron* special master's description of Dr. Akbari's approach is particularly apt: "In effect, he seeks to do what so many other unsuccessful claimants attempt: describe ways in which vaccines impact the immune system, and then convert that into a story of an aberrant process, but without the kind of specific support needed to find it likely could occur." 2025 WL 408219, at *21. Indeed, in a case before the undersigned voluntarily dismissed by the petitioner the very same day as this ruling, Dr. Akbari invoked a theory based on inflammasomes in an attempt to explain how the flu vaccine can cause sensorineural hearing loss. No. 22-1432V, Slip. Op. ECF No. 56 (October 19, 2026).

[15] *Nieves v. Sec'y of Health & Human Servs*., No. 18-1602V, 2023 WL 3580148, at *44 (Fed. Cl. Spec. Mstr. May 22, 2023) (observing that Dr. Akbari's "overall theory amounts to a confusing, inter-related patchwork of contentions, backed up with proof that obscured more than illuminated"), *mot. for rev. denied*, 167 Fed. Cl. 422 (2023); *Williams*, 2024 WL 5040482, at *42 (indicating that "Dr. Akbari offers a treatise of possible immunological concepts, drawn from various clinic studies, but these ideas are not developed, and all fall short of explaining how the flu vaccine can cause [fibromyalgia]. He discusses cytokines, chemokines, and inflammasomes and their roles in causing inflammation. But he does not address basic questions."); *Efron*, 2025 WL 408219, at *21 (stating that "Dr. Akbari's theory also has a poorly-substantiated, globally-overarching character, in which the initial event of vaccination manages to wreak havoc at *every step of the immune process*, from the innate production of cytokines when the vaccine is first administered, to the immune system's self-regulating safeguards, to the adaptive system's targeted response to the vaccine's antigens. Such a theory is too sweeping to be deemed preponderantly-established."); *Cote*, 2026 WL 1555934, at *27 (explaining that, despite submitting nearly 50 articles, Dr. Akbari's theory of causation did not meaningfully move beyond "broad reliance on autoimmune processes"); *Holsworth*, 2026 WL 2607559, at *19 (stating that "respondent and his expert are persuasive in contending that much of Dr. Akbari's opinion reflects extended discussion of immune concepts that could provide some context for a well-supported theory, but that are not themselves probative of the causal relationship petitioner seeks to show").

And, notably, prior petitioners have preponderantly demonstrated that the high dose flu vaccine can cause nausea and vomiting. *Crawford v. Sec'y of Health & Human Servs.*, No. 18-198V, 2023 WL 5815719, *13 (Fed. Cl. Spec. Mstr. July 27, 2023) (explaining that "petitioner has provided preponderant evidence of a sound and reliable theory to explain how the high-dose influenza vaccine can, within hours of vaccination, cause nausea, vomiting, and malaise"); *Halverson v. Sec'y of Health & Human Servs.*, No. 15-227V, 2020 WL 992588, at *23 (Fed. Cl. Spec. Mstr. Feb. 4, 2020) (crediting a study showing flu vaccine recipients experienced, inter alia, vomiting, and noting the petitioner in that case had experienced vomiting the night after receiving the Fluzone vaccine).

The package insert for the Fluzone vaccine at issue in this case documents that vomiting was reported as part of the post-marketing experience. (Sanofi Pasteur 522 Fluzone High-Dose Quadrivalent: Highlights of Prescribing Information [hereinafter Fluzone Package Insert] (Ex. E, Tab 6, p. 5).) Of course, post-marketing experience is more akin to case reporting given that it accumulates spontaneous, voluntary reports from a population of unknown size. *H.L. ex rel. A.I. v. Sec'y of Health & Human Servs.*, No. 10-0197V, 2016 WL 3751848, at *13 (Fed. Cl. Spec. Mstr. Mar. 17, 2016) (accepting respondent's expert's opinion that "postmarketing experience is distinct, and of lesser significance than, either contraindications or warnings"), *mot. for rev. denied*, 129 Fed. Cl. 165 (2016), *aff'd*, 715 F. App'x 990 (Fed. Cir. 2017); *Tompkins v. Sec'y of Health & Human Servs.*, No. 10-261V, 2013 WL 3498652, at *14 (Fed. Cl. Spec. Mstr. June 21, 2013) (indicating that where conditions "appear in package inserts without any attribution of causality," "they are on par with VAERS reports, which are not probative evidence of vaccine causation"). However, that is not to say that post-marketing experience carries no weight at all. *Accord Paluck v. Sec'y of Health & Human Servs.*, 104 Fed. Cl. 457, 475 (2012) (stating that "the fact that case reports can by their nature only present indicia of causation does not deprive them of all evidentiary weight" (quoting *Campbell v. Sec'y of Health & Human Servs.*, 97 Fed. Cl. 650 (2011))).

Although the package insert does disclaim the conclusion that post-marketing experience establishes any causal relationship, it is explicit in documenting that these events "may occur in people receiving Fluzone High-Dose Quadrivalent." (Fluzone Package Insert, *supra*, at Ex. E, Tab 6, p. 5.) While this cannot be equated to a warning or contraindication, it is based on the representation that "[a]dverse events were included based on one or more of the following factors: severity, frequency of reporting, or strength of evidence for a causal relationship." (*Id.*) This is still not robust evidence; however, it is an indication that some threshold screening was used to determine whether the post-marketing reports rose to a level of *potential* significance. Moreover, given that vomiting is not in itself indicative of a serious or severe condition, this would suggest that this consideration was based either on frequency or some evaluation of causal evidence. I also take some notice of the fact that Ms. McNamee's treating cardiologist accepted the postmarketing experience when evaluating her condition. (Ex. 4, p. 190.) However, while I accept the post-marketing experience as *some* evidence, I stress that the post-marketing experience standing alone does not meet petitioner's burden of proof for the reasons stated above.

An additional study cited by Dr. Brown also found that reports to VAERS of non-serious adverse effects following Fluzone vaccination documented nausea in 18% of reports and vomiting in 12% of reports. (Woo & Moro, *supra*, at Ex. 44, p. 2, tbl. 2.) Of course, studies based on VAERS data likewise have significant shortcomings. *E.g.*, *Cooper v. Sec'y of Health & Human Servs.*, No. 18-1885V, 2024 WL 1522331, at *17 n.17 (Fed. Cl. Spec. Mstr. Mar. 12, 2024) (accepting respondent's expert's explanation that a study based on VAERS data constitutes "a pretty low level of evidence"); *see also Analla v. Sec'y of Health & Human Servs*., 70 Fed. Cl. 552, 558 (2006) (indicating that "[t]he Court uniformly has upheld the Chief Special Master's concerns about the reliability of VAERS data"); *Ryman v. Sec'y of Health & Human Servs*., 65 Fed. Cl. 35, 43 (2005) (accepting, inter alia, the concern that VAERS "reports may be biased towards pre-existing notions of adverse events"). However, the *Crawford* special master persuasively noted that it may not be realistic to expect a robust study of non-serious and transient effects, such as vomiting, both because it would be potentially difficult to capture such transient events and because it would be difficult to secure research funding for such a minor issue. *Crawford*, 2023 WL 5815719, at *16.

And, finally, while I am not persuaded by Dr. Akbari's specific hypothesis that a post-vaccination activation of inflammasomes can stimulate the areas of the brain responsible for nausea and vomiting,[16] he did cite one study by Christian et al. that more generally associates constitutional post-vaccination symptoms, including nausea, to post-vaccination cytokine elevations. (Lisa M. Christian et al., *Proinflammatory Cytokine Responses Correspond with Subjective Side Effects After Influenza Virus Vaccination*, 33 VACCINE 3360 (2015) (Ex. 55, pp. 1-2); *see also* Ex. 48, pp. 1-2.) The study authors explain that their results are consistent with the notion that subjective reports of systemic reactions following vaccination may correspond to an inflammatory state due to "normal mild inflammatory responses to the vaccine" that are not meaningful predictors of antibody response or immunogenicity. (Christian et al., *supra*, at Ex. 55, p. 2.) They note that "[v]accines, including influenza virus vaccine, induce relatively mild and transient inflammatory responses. In turn, inflammation is implicated in pain, malaise, fatigue, and general sickness behaviors." (*Id.* (endnotes omitted).) This is consistent with the theory of causation that was accepted in *Crawford*. 2023 WL

[16] As explained above, Dr. Akbari's opinion that the flu vaccine can lead to nausea and vomiting boils down to the assertion, supported by citation to four papers, that activated IL-1β, which he asserts to be a product of post-vaccination inflammasome activation, "is a potent endogenous factor and induces symptoms such as chills, rigors, fever, nausea, vomiting, headache and fatigue when injected into humans." (Ex. 48, p. 3 (citing Dinarello, *supra*, at Ex. 53; Dinarello, *supra*, at Ex. 54); *see also* Ex. 80, p. 7 (citing Liu et al., *supra*, at Ex. 90; Dutcher et al., *supra*, at Ex. 91).) Significantly, however, all of the papers cited by Dr. Akbari involved direct injection of IL-1, which is not equivalent to receiving a flu vaccination. Instead, Dr. MacGinnitie persuasively observes that the Tang study otherwise cited by Dr. Akbari shows that only live attenuated flu vaccinations, but *not* inactivated influenza vaccines like the vaccine Ms. McNamee received, produced elevated levels of IL-1β. (Ex. E, p. 6 (citing Weichun Tang et al., *Post-Vaccination Serum Cytokines Levels Correlate with Breakthrough Influenza Infections*, 13 SCI. REPS. 1 (2023) (Ex. 56)).) Even Crooke et al., which examined influenza infection, rather than vaccination, observed only "very modest" elevations. (*Id.* at 6-7 (discussing Crooke et al., *supra*, at Ex. 49).)

5815719, at *13-16. Although this study observed only nausea and not necessarily vomiting, it is reasonable to simply infer that nausea can lead directly to vomiting.

Cytokine theories are generally not viewed favorably when petitioners seek to leverage the intended cytokine response to vaccination as a means to explain how a vaccine could commence a parade of immunologic horribles leading to all manner of injuries. *E.g.*, *Osenbach v. Sec'y of Health & Human Servs.*, No. 16-419V, 2023 WL 5714809, at *29 (Fed. Cl. Spec. Mstr. Aug. 8, 2023) (explaining that "Program petitioners often advance theories that upregulation of cytokines by vaccines can become pathogenic in some manner—but more often than not, such theories are found wanting, especially to the extent they over-rely on expected vaccine function to form the basis for a causation theory"); *Putnam v. Sec'y of Health & Human Servs.*, No. 19-1921V, 2022 WL 600417, at *21 (Fed. Cl. Spec. Mstr. Jan. 31, 2022) ("The fact that the initial/innate response to vaccination transiently causes increased cytokine levels (a fact that can easily be substantiated by science, as studies often reveal) does *not* imply an aberrant reaction ensues—and it cannot be assumed this has occurred in a petitioner's case, based solely on the subsequent injury."). However, the fact that transient post-vaccination constitutional symptoms are cytokine-driven is not controversial. *E.g.*, *Catone v. Sec'y of Health & Human Servs.*, No. 19-690V, 2025 WL 2692275, at *22 (Fed. Cl. Spec. Mstr. Aug. 8, 2025) (noting that, despite contesting that cytokines contributed to the injury alleged, respondent's expert agreed that vaccines often produce cytokines that result in symptoms, such as pain and redness at the injection site, fever, or malaise). Accordingly, while Dr. Akbari has been criticized for overstating the significance of the Christian study relative to his repeated inflammasome theories, *e.g.*, *Galeno v. Sec'y of Health & Human Servs.*, No. 21-824V, 2026 WL 2390645, at *19 (Fed. Cl. Spec. Mstr. July 9, 2026), it does appear to provide some reasonable evidence supporting vomiting as a post-vaccination adverse event. *Accord Santiago v. Sec'y of Health & Human Servs.*, No. 21-1562V, 2026 WL 2250479, at *17 (Fed. Cl. Spec. Mstr. July 8, 2026) (rejecting Dr. Akbari's reliance on Christian et al. as evidence regarding the condition of ITP, but noting that it associated pro-inflammatory cytokines with local and systemic responses occurring shortly after vaccination). Dr. Messé filed a study finding no increased risk of *serious* gastrointestinal illnesses following flu vaccination. (Talbot et al., *supra*, at Ex. C, Tab 9.) However, the authors also noted that increased post-vaccination cytokine levels have been hypothesized to elicit a variety of symptoms, including gastrointestinal symptoms, and further noted that two large, retrospective studies had previously shown increased frequency of gastrointestinal events in children following flu vaccination. (*Id.* at 3.)

Accordingly, considering all of the above, petitioner has met her preponderant burden of proof under *Althen* prong one with respect to the question of whether a high dose flu vaccine can cause transient nausea and vomiting.

**b. *Althen* prong three**

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term

has been equated to the phrase "medically-acceptable temporal relationship." *Id*. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id*.; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. denied sub nom. C.K. v. Sec'y of Health & Human Servs.*, 113 Fed. Cl. 757 (2013), *aff'd sub nom. Koehn v. Sec'y of Health & Human Servs.*, 773 F.3d 1239 (Fed. Cir. 2014).

Petitioner places the timing of onset in this case at three hours post-vaccination when she began experiencing chills, nausea, vomiting, and diarrhea. (ECF No. 78, p. 36.) She contends that "Dr. Akbari explained IL-1α levels significantly increase within 30 minutes of flu vaccination and peaks at 90 minutes." (ECF No. 78, p. 36 (citing Dinarello, *supra*, at Ex. 53).) Further, "[a]ctivated IL-1β can directly induce symptoms such as chills, rigors, fever, nausea, vomiting, headache and fatigue when introduced into the human body." (*Id*. (citing Dinarello, *supra*, at Ex. 53; Dinarello, *supra*, at Ex. 54).) Petitioner stresses that both IL-1α and IL-1β bind to the same receptor and contribute to a signaling cascade leading to a hypersensitivity response that can manifest as chills, nausea, and vomiting. (*Id*. (citing Ex. 48, pp. 3-4).) Thus, petitioner argues that the timing of onset in this case "aligns precisely" with Dr. Akbari's inflammasome activation theory. (*Id*.)

Respondent notes, however, that Dr. Akbari additionally relied on a memory T-cell response as part of an IL-17 driven Th-17 phenotype. (ECF No. 85, pp. 28-29.) He stresses that an adaptive immune response is not activated within mere hours. (*Id.*) Respondent points out that Dr. Akbari himself stated that inflammasome activation takes 1-3 days to develop a Th-17 phenotype. (*Id*. at 29 (citing Ex. 48, p. 6).) Even narrowing focus to inflammasomes and cytokines, respondent does not agree that the timing in this case is appropriate. (*Id*.) Respondent argues that two papers submitted by petitioner (Crooke et al. and Christian et al.) found only that inflammasome-dependent cytokines IL-1β and IL-18 were elevated at 24 hours post-vaccination, when first measured. (*Id*.) By contrast, Wan et al.[17] only saw modest increases at six and twelve hours after influenza infection. (*Id*. at 29-30 (citing Ex. E, pp. 7-8).) Respondent urges that several other studies cited by Dr. Akbari are not on point. (*Id*. at 30.)

Because I have concluded that petitioner has met her burden of proof under *Althen* prong one without crediting Dr. Akbari's immunologic explanation, a significant portion of the parties' briefing relative to *Althen* prong three is moot. For example, respondent's criticisms regarding Dr. Akbari's reliance on adaptive immunity is

[17] Pin Wan et al., *AP-1 Signaling Pathway Promotes Pro-IL-1β Transcription to Facilitate NLRP3 Inflammasome Activation upon Influenza A Virus Infection*, 13 VIRULENCE 502 (2022) (Ex. 50).

immaterial because the timing of his proposed mechanism is not controlling. Respondent is correct that the Crooke and Christian papers did not measure cytokine levels prior to 24-hours post-vaccination; however, because at least some of the cytokines measured in the Christian study were elevated as of the initial measurement (Christian et al., *supra*, at Ex. 55, p. 11, fig 1), this is not dispositive of earlier potential onsets. For example, respondent's expert acknowledges that the Wan study observed elevations of certain cytokines, albeit "modest," after six hours. (Ex. E, pp. 7-8.) Although there is no evidence that explicitly confirms that cytokine elevations can occur within three hours of vaccination, there also is no evidence of record that explicitly contradicts that assertion.

Instead, the Fluzone package insert is no more specific than to indicate that most common reactions, such as constitutional symptoms of myalgia, headache, or malaise, occurred within three days of vaccination and identified no minimum latency for the reported symptoms. (Fluzone Package Insert, *supra*, at Ex. E, Tab 6, p. 3.) However, the Woo study cited by Dr. Brown indicates that, among adverse events reported to VAERS regarding the high-dose flu vaccine, the median interval for onset was "0" days, meaning that most reported events occurred within a day of vaccination. (Woo & Moro, *supra*, at Ex. 44, p. 2.) Moreover, both the *Halverson* and *Crawford* special masters previously accepted that the high-dose Flu vaccine can lead to vomiting within hours. *Halverson*, 2023 WL 992588, at *9, *27-28; *Crawford*, 2023 WL 5815719, at *4, *18-19. And, significantly, the Federal Circuit cautions against setting "hard and fast deadline[s]" for onset. *See Paluck v. Sec'y of Health & Human Servs*., 786 F.3d 1373, 1383-84 (Fed. Cir. 2015) (stating that "[t]he special master further erred in setting a hard and fast deadline" for onset and noting that the medical literature filed in the case "do not purport to establish any definitive timeframe for the onset of clinical symptoms").

Accordingly, considering all of the above, petitioner has met her preponderant burden of proof under *Althen* prong three with respect to the question of whether it is reasonable to infer that nausea and vomiting occurring about three hours after administration of a high dose flu vaccine was caused by that vaccination.

#### c. *Althen* prong two

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a vacinee's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant*, 956 F.2d at 1148. Medical records are generally viewed as particularly trustworthy evidence. *Cucuras*, 993 F.2d at 1528. However, medical records and/or statements of a treating physician's views do not *per se* bind the special master. *See* § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder*, 88 Fed. Cl. at 745 n.67 ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted."). A petitioner may support a cause-in-fact claim through either medical records or expert medical opinion. § 300aa-13(a). The special master is required to

consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines*, 940 F.2d at 1528).

Additional to Dr. Akbari's immunologic theory, petitioner stresses that Dr. Brown opined that it was Ms. McNamee's dehydration, rather than her pre-existing risk factors, that explains her atrial fibrillation and stroke. (ECF No. 78, pp. 35-36.) In particular, Ms. McNamee had no prior history of atrial fibrillation, and just prior to vaccination, she presented to her cardiologist with no complaints, fair control of her hypertension and dyslipidemia, and an unremarkable encounter. (*Id*. at 35.) She also had no signs of infection prior to her stroke. (*Id*.) Moreover, petitioner stresses that Ms. McNamee's treating physician, Dr. Hussain, specifically noted that vomiting and vasoplegia are known, albeit uncommon, side effects of vaccination and other physicians later documented an allergy to the flu vaccine. (*Id*. at 32-33.)

Respondent stresses that, under *Althen* prong two, petitioner must do more than merely demonstrate that her injury followed vaccination. Afterall, her claim is based on causation-in-fact, which does not enjoy a presumption of causation. (ECF No. 85, pp. 23-24.) Here, Ms. McNamee had numerous major risk factors for stroke, along with multiple ailments (cancer and pneumonia) that additionally placed her at risk for atrial fibrillation. (*Id*. at 24-25.) Moreover, there is no evidence in the medical records to indicate that she was experiencing any local or systemic reaction to the vaccine, or even that she was experiencing any inflammatory response of any kind. (*Id*. at 25-26.) And, in fact, she was repeatedly documented as afebrile. (*Id*.) And finally, in any event, even if one accepted that her episode of vomiting and diarrhea were vaccine-related, the medical records do not support the conclusion that Ms. McNamee was dehydrated. (*Id*. at 26.) Respondent does not agree that any of Ms. McNamee's treating physicians attributed her stroke to her vaccination. (*Id*. at 26-27.)

Respondent is, of course, correct that the fact that Ms. McNamee's atrial fibrillation occurred for the first time post-vaccination does not, without more, meet petitioner's burden of proof under *Althen* prong two. The Federal Circuit has explained that "[a]lthough probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation."[18] *Althen*, 418 F.3d at 1278 (citing *Grant*, 956 F.2d at 1149). However, petitioner's showing is not so limited.

Respondent argues that, even if petitioner's nausea and vomiting were part of the causal chain leading to her stroke, the flu vaccine cannot be implicated without evidence of a systemic response including, most notably, fever. However, although it is true that fever is a common symptom of an inflammatory response, *e.g.*, Christian et al., *supra*, at Ex. 55, p. 1, the package insert for the Fluzone vaccine at issue documents

[18] However, the Federal Circuit has also indicated that satisfaction of *Althen* prongs one and three can be probative with respect to *Althen* prong two. *Capizzano*, 440 F.3d at 1326-27.

that in the clinical trials fever was less commonly reported than any other symptom of a systemic reaction, including shivering and myalgias. (Fluzone Package Insert, *supra*, at Ex. E, Tab 6, p. 4.) In Ms. McNamee's case, the history of present illness was clear and consistent in documenting that she experienced a number of flu-like symptoms beyond simply experiencing vomiting. (Ex. 4, p. 182.) In particular, though fever was inconsistently reported, chills (or shivers) and body aches (or myalgia) were consistently reported. (*Id.* at 182, 202, 275; Ex. 5, p. 52.) Additionally, Dr. MacGinnitie is not persuasive in seeking to link systemic reactions to local injection site reactions. While the clinical trial for Fluzone documented a high percentage of injection site pain, fewer subjects had outward injection site symptoms, such as swelling or redness, than had experienced systemic symptoms, such as malaise or body aches. (Fluzone Package Insert, *supra*, at Ex. E, Tab 6, p. 4.) Accordingly, the evidence preponderantly favors the conclusion that Ms. McNamee experienced symptoms consistent with what the Fluzone clinical trials documented as symptoms of a systemic reaction. (*Id.*) Moreover, her treating neurologist felt that her reported symptoms "seem[ed] like some adverse reactions from flu vaccine." (Ex. 5, pp. 52-53.)

Respondent also challenges the notion that Ms. McNamee's vomiting and diarrhea left her dehydrated. This too is unpersuasive. Although respondent is correct that Ms. McNamee's BUN was normal, that is only one potential measure of dehydration and his experts did not explain why that finding should be treated as singularly dispositive in light of Ms. McNamee's overall presentation, especially given that she was observed to be hypovolemic without any other identified cause. Ms. McNamee was explicitly reported by history as being "significantly dehydrated" (Ex. 4, pp. 202, 360) and had "markedly elevated" specific gravity on urinalysis, which Dr. Hussain felt was indicative of intravascular volume depletion. (Ex. 4, pp. 105, 113, 182; Ex. 47, p. 7.) Further still, the medical records confirm that Ms. McNamee was treated with multiple boluses of lactated Ringer's fluid in treatment of dehydration. (Ex. 4, p. 190 (Dr. Hussain noting volume resuscitation for hypovolemia); *id.* at 205 (noting Ms. McNamee became more hemodynamically stable after multiple boluses of lactated Ringer's); Ex. 47, p. 3 (Dr. Brown opining that Ms. McNamee's treatment with lactated Ringer's fluid was in treatment of dehydration).)

Both parties' experts agree that atrial fibrillation is a common cause of stroke, and there is no dispute that Ms. McNamee's stroke, in particular, was due to atrial fibrillation. (Ex. C, p. 4; Ex. 47, pp. 6, 9.) On petitioner's behalf, Dr. Brown does not dispute that Ms. McNamee had underlying risk factors for atrial fibrillation. (Ex. 47, p. 7.) However, he also opines that activation of the sympathetic nervous system by physiologic stressors, including dehydration, is a recognized trigger of atrial fibrillation. (*Id.* at 6.) Thus, having concluded that Ms. McNamee's vaccination resulted in an acute episode of flu-like symptoms that included fluid loss through vomiting, he opines that the flu vaccine can be viewed as the initiator of a series of physiologic steps that led to her stroke. (Ex. 78, p. 2.) On this record, Dr. Brown's proposed series of physiologic events represents a logical sequence of cause and effect whereby Ms. McNamee's vaccination represented a substantial contributing factor and but for cause of her stroke. Even following petitioner's presentation of Dr. Brown's opinion, respondent remained

focused on the immunologic aspects of this case and never had Dr. Messé respond to Dr. Brown's report. Nor, for that matter, has respondent raised any specific argument in his motion response contesting that dehydration can lead to atrial fibrillation.

Respondent's expert, Dr. Messé, stresses that Ms. McNamee had "extensive vascular risk factors which put her at risk of developing atrial fibrillation including advanced age, hypertension, hyperlipidemia, coronary artery disease, and active use of cigarettes." (Ex. C, p. 4.) He also notes that she was later discovered to have cancer, which is also a risk factor for atrial fibrillation. (*Id.*) Additionally, he notes that there was evidence that she also had pneumonia, which can be a trigger of atrial fibrillation. (*Id.*) However, the treating physicians did not clearly articulate any opinion as to the underlying cause of Ms. McNamee's condition. Though Dr. Hussain did suggest that Ms. McNamee thereafter was at risk for recurrent atrial fibrillation due to her underlying history of cardiovascular disease, she also noted that Ms. McNamee had no prior history of valvular disease or LV systolic dysfunction and otherwise observed that the stroke occurred following a new onset of atrial fibrillation "in the setting of a reaction to the high dose influenza vaccine."[19] (Ex. 4, pp. 189-90; Ex. 2, p. 5.) Moreover, in remarking on Ms. McNamee's abnormal troponin levels during her hospitalization, Dr. Hussain indicated that Ms. McNamee's condition was likely multifactorial, with troponin levels being affected by a combination of her stroke, hypotension, atrial fibrillation, and hypovolemia. (Ex. 4, p. 190.)

In sum, petitioner has demonstrated pursuant to *Althen* prong one that the vaccine at issue can cause nausea and vomiting; she has demonstrated pursuant to *Althen* prong three that such nausea and vomiting can occur shortly after vaccination; and she has demonstrated pursuant to *Althen* prong two not only that Ms. McNamee's nausea and vomiting occurred in the context of symptoms consistent with a systemic reaction to the vaccination at issue, but also that she suffered significant dehydration as a result and that dehydration can lead to atrial fibrillation and stroke. Although Dr. Messé and respondent are correct that Ms. McNamee otherwise had substantial risk factors for atrial fibrillation, petitioner's showing is still enough to demonstrate a logical sequence of cause and effect that also implicates Ms. McNamee's flu vaccination as a but for cause and substantial contributing factor in the development of her atrial fibrillation and stroke. Afterall, even as Ms. McNamee's underlying risk factors likely played a significant role in predisposing her to atrial fibrillation, petitioner does not bear any burden of demonstrating that the vaccination was the sole cause of Ms. McNamee's injury. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Indeed, although Ms. McNamee was clearly at substantial risk of developing atrial fibrillation, given the new onset of atrial fibrillation in the context of an acute episode of flu-like symptoms and clear evidence of resulting dehydration, to overlook Ms. McNamee's preceding vomiting as a significant factor would be to ignore the elephant in the room. And, although Dr. Messé offered some suggestion that Ms. McNamee's initial symptoms may have been due to pneumonia (Ex. C, p. 5), she was not definitively diagnosed with pneumonia.

---

[19] Although Dr. Hussain did also make note of the fact that Fluzone post-marketing experience included vomiting (Ex. 4, p. 190), she stopped short of stating a causal opinion.

To be clear, however, as discussed under *Althen* prong one, this is not a ruling that the flu vaccine can cause either atrial fibrillation or stroke. Ms. McNamee's atrial fibrillation and stroke were caused by some combination of her preexisting risk factors and her dehydration. Anything that can cause dehydration could have acted as the "fist domino" to cause this injury. In this case, it just happens to have been a transient vaccine reaction that otherwise would not be harmful in itself. As Dr. Messé observed, the flu vaccine was recommended for Ms. McNamee because of her vascular risk factors. (Ex. C, p. 5.)

Accordingly, considering all of the above, petitioner has met her burden of proof under *Althen* prong two.

### d. Factor unrelated

Once petitioner has met her own prima facie burden of proof, respondent may still demonstrate by a preponderance of evidence that the injury was nonetheless caused by a factor unrelated to the vaccination. § 300aa-13(a)(1)(B); *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367 (Fed. Cir. 2013). In order to meet his burden, respondent must demonstrate by preponderant evidence "that a particular agent or condition (or multiple agents/conditions) unrelated to the vaccine was in fact the sole cause (thus excluding the vaccine as a substantial factor)." *de Bazan*, 539 F.3d at 1354 (emphasis omitted). In this case, both Drs. MacGinnitie and Messé opine that Ms. McNamee's underlying risk factors and comorbidities more likely than not led to her atrial fibrillation unrelated to her vaccination. (Ex. A, p. 8; Ex. C, pp. 4-5; Ex. E, p. 10.) However, for the same reasons as discussed above, respondent cannot preponderantly establish that the other potential contributing factors to petitioner's atrial fibrillation and stroke exclude her vaccination as an additional significant contributing factor and but for cause of the injury.

## VI. Conclusion

After weighing the evidence of record within the context of the Vaccine Program, and for all of the reasons discussed above, I find that petitioner is entitled to compensation for Ms. McNamee's atrial fibrillation and stroke, which she has preponderantly demonstrated to have been caused in part by her October 16, 2020 flu vaccination. A separate damages order will be issued.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master